Filed 7/18/14  P. v. Avila CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JORGE AVILA,<br><br>    Defendant and Appellant. | B250330<br><br>(Los Angeles County<br>Super. Ct. No. PA074535)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING PETITION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed June 23, 2014, be modified as follows:

On slip opinion page 5, line 10, delete the word "murder" and insert in its place: "carjacking."

The rehearing petition filed July 8, 2014, is denied.

_____    _____    _____
            MINK, J.[*]                         TURNER, P.J.                    KRIEGLER, J.

_____

[*]      Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B250330 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA074535) |
| v. | |
| JORGE AVILA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David B. Gelfound, Judge.  Affirmed.

Linda L. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jorge Avila was convicted, following a jury trial, of two counts of carjacking in violation of Penal Code section 215, subdivision (a). The trial court found true the allegations that appellant had suffered a prior serious or violent felony conviction within the meaning of Penal Code sections 667 subdivisions (b) through (i) and 1170.12 (the "three strikes" law) and Penal Code section 667, subdivision (a) and has served four prior prison terms within the meaning of Penal Code section 667.5, subdivision (b). The court sentenced appellant to a total term of 27 years, four months in state prison, consisting of the upper term of nine years on count 1, doubled to 18 years pursuant to the three strikes law, plus a five-year enhancement term pursuant to Penal Code section 667, subdivision (a), plus a consecutive term of four years, four months for the count 2 conviction and Penal Code section 667.5, subdivision (b), enhancement.

Appellant appeals from the judgment of conviction, contending the trial court erred prejudicially in refusing to admit certain out-of-court statements by appellant and failing to instruct the jury on the defense of necessity and further contending there is insufficient evidence to support his conviction on one of the carjacking counts. Appellant also contends the trial court abused its discretion by imposing the upper term for the count 1 carjacking conviction. We affirm the judgment of conviction.


Facts

On September 2, 2012, in the evening, Jahir Rivas parked his 2013 Nissan Altima in the 7-Eleven store parking lot at the intersection of Hubbard Street and Borden Avenue in Los Angeles. Rivas's friends "Mario," Juan Alzaga, Maritza Guillen, Joanna Gomez and Patricia Ramos were in the car. As Rivas and Mario walked toward the store, appellant approached Rivas and asked if he had any spare change. Rivas said no and walked into the store with Mario.

Ramos got out of the car to make a phone call. Appellant approached her and asked for money. Ramos was afraid and got back into the car. Appellant came over to the car and tried to make conversation with its occupants. He leaned in through the window and started "looking inside the car taking [a] view of the interior." Alzaga told

2

appellant to get away. When appellant did not leave, Alzaga got out of the car and again said, "Get away."

Appellant moved toward Alzaga "aggressively." Appellant cursed and asked if Alzaga "wanted a piece of him." Alzaga stated that he saw appellant make a fist, felt threatened and punched appellant as he drew near. According to Guillen, appellant hit Alzaga first. Appellant punched Alzaga about ten times and pushed him. Alzaga fell to the ground. Appellant got on top of Alzaga and continued hitting him.

Guillen yelled at appellant to leave Alzaga alone. Appellant grabbed Guillen's hair, and hit her two or three times in the face with his fist. Ramos saw appellant hit Guillen in the eye. Guillen hit appellant back. Ramos and Gomez went inside the 7-Eleven.

A stranger intervened in the fight between appellant and Alzaga, pulling appellant away from Alzaga. Alzaga got back into the car and closed the door. The stranger left. Appellant was able to open the car door and pulled Alzaga out by the leg. Appellant continued hitting Alzaga.

Rivas called 911 from inside the store, then came outside and told appellant he was calling 911. Appellant replied, "Go ahead. Call the police." He then tried unsuccessfully to take Rivas's phone, and hit him on the cheek.

Appellant ran to Rivas's car. Rivas tried to stop him. Appellant was able to start the car because it had a button which could start the engine if the key fob was within ten feet of the car. Appellant put the car into reverse. Rivas reached through a car window and tried to put the car back into park. Appellant put the car into motion, and tried to push Rivas away. Rivas held on for five to ten seconds before letting go of the moving car.

Appellant backed the car into a wall, turned, and crashed again. Rivas was in front of the car, and appellant drove the car toward Rivas. Rivas ran inside the 7-Eleven. Police arrived.

Rivas received a cut finger during the incident. Rivas was afraid of appellant because appellant appeared to be "under the influence" and Rivas believed appellant was

3

carrying a weapon. Rivas did not brandish a gun and neither did any of his friends. Rivas thought appellant might hurt him because appellant was acting "aggressively."

Los Angeles Police Department Officers David Romo and Rebecca Ruiz responded to a call at 11:20 p.m. on September 2. They found Rivas's car at the intersection of Shenley Street and Simshaw Avenue in Los Angeles, about two miles from the 7-Eleven. Officer Romo observed that the right passenger side of the car had traffic collision damage, the rear bumper or muffler was damaged and the right front tire was flat.

Appellant's girlfriend Elia Lampman testified on appellant's behalf. She had known appellant for about five years. On the night of September 2, appellant came home between 11:00 p.m. and 12:00 a.m. She was asleep in the bedroom. She heard appellant come in and say, "Somebody tried to kill me. I had to run away." His voice was "completely different." He sounded "paranoid."

In rebuttal, Detective Marc Medero testified that the distance between appellant's residence and the location where Officer Romo found Rivas's car was about two miles.

Discussion

1. Appellant's statements

Appellant made a series of statements when he returned home between 11:00 p.m. and 12:00 a.m. on the night of the incident, and made other statements concerning the incident the next morning. At the hearing to determine the admissibility of those statements, appellant's girlfriend Lampman testified that she was in the bedroom when appellant returned home and heard him speaking in another room. According to Lampman, appellant said that "he had to run away because everybody tried to kill him, that he got beat up real bad, and he doesn't know why but he was terrified." He also said, "Why [are] they attacking me? Why? I didn't do anything wrong. And I had to hide. They are gonna kill me."

Lampman also recounted statements appellant made to her the next day about the incident. She asked him why he looked so bad and what had happened. He said that "he

4

went to the liquor store, . . . 7-Eleven. He went to get cigarettes and he got beat up and just had to get out of the situation, and he just took a car to get away for a few blocks . . . and that he left the car right there in a few blocks."

The court ruled that Lampman could testify to "the fact that [appellant] was acting unusual that night, his demeanor was odd. I also will allow the defense to get in the statement they are trying to kill me. That would be it."[1] The court found this one statement fell under the state of mind exception.

Appellant contends the trial court abused its discretion in excluding the other statements he made to Lampman. He contends the statements he made the night of the murder were admissible under the spontaneous statement exception to the hearsay rule in Evidence Code[2] section 1240 and the statements he made the next day were admissible under the state of mind exception in section 1250.

a. Statements made the night of the incident

Section 1240 provides that evidence of a statement "is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant and [¶] (b) Was made spontaneously under the stress of excitement caused by such perception."

"For admission of a spontaneous statement, (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it. [Citations.] Whether the statement was

---

[1] Lampman testified before the jury that appellant said, "[S]omebody tried to kill me. I had to run away."

[2] All further statutory references are to the Evidence Code unless otherwise specified.

made before there was time to contrive and misrepresent is informed by a number of factors, including the passage of time between the startling occurrence and the statement, whether the statement was a response to questioning, and the declarant's emotional state and physical condition. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 925 [internal quotation marks omitted].)

The proponent of a hearsay statement must prove "the collateral factual matters which bring the statement within an exception to the hearsay rule." (*People v. Tewksbury* (1976) 15 Cal.3d 953, 966.) The facts must be proven by a preponderance of the evidence. (*Ibid.*)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury." (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) "The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter." (*People v. Morrison* (2004) 34 Cal.4th 698, 719.) "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811.)

Here, the trial court found appellant's statements were not spontaneous, "based on the length of time, based upon the reliability of the statements, the fact they were made while he's in a room by himself, unknown if he's referring to anyone else who may be in the room, may be on the phone." The trial court did not abuse its discretion in so ruling.

Lampman's inability to see appellant while he was making the statements at issue resulted in an absence of evidence for two key factors relating to the spontaneity of a statement. As the trial court noted, it was unknown whether appellant was speaking to someone on the phone. (*People v. Brown* (2003) 31 Cal.4th 518, 541 [Whether the statements "'were delivered directly or in response to a question" is an "important factor[] to be considered on the issue of spontaneity.' [Citations.]"].) Similarly, appellant's demeanor was largely unknown. There was no evidence of appellant's facial expression or physical condition when he made the statements, both of which are

6

significant circumstantial evidence of a person's state of mind. (*People v. Clark, supra*, 52 Cal.4th at p. 925 [declarant's physical condition is a factor to be considered].)

An additional unknown factor was the amount of time which had elapsed between the incident at the 7-Eleven and appellant's statements. Lampman testified appellant returned home between 11:00 p.m. and 12:00 a.m. The incident at the 7-Eleven took place sometime between 9:00 p.m. and 11:15 p.m.[3] As much as three hours could have passed between the incident and appellant's statement or as little as 30 minutes. (*People v. Gutierrez, supra*, 45 Cal.4th at p. 810 ["amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited."]

It was appellant's burden to prove the facts necessary to bring his statement within the spontaneous statement exception to the hearsay rule. We see no abuse of discretion in the trial court's finding that the facts before the court were not sufficient to do so.

b. Statements made the following day

Section 1250 provides in pertinent part that "evidence of a statement of the declarant's then existing state of mind, emotion or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

---

[3] Rivas testified that he went to a party with some friends, arriving at the party at 7:30 or 8:30 p.m. He stayed about an hour and a half. Rivas and his friends then left the party and drove and to the 7-Eleven. Thus, the incident could have begun as early as 9:00 p.m. Riva's car was recovered at about 11:20 p.m. in a location about two miles from the 7-Eleven. Thus, appellant must have left the 7-Eleven no later than 11:15 p.m. The car was found about two miles from appellant's residence. If appellant travelled on foot at between three and four miles per hour, it would have taken him 20 to 40 minutes to reach home.

7

"[S]uch declarations are competent only when they are indicative of the declarant's mental state at the very time of their utterance, and only for the purpose of showing that mental state. It follows from this that unless his mental state at that time is material to the issue under investigation, the declarations are not admissible, even though they do show his mental state at that time, not because they are not competent for that purpose, but because that purpose is not germane to the issue." (*In re Estate of Anderson* (1921) 185 Cal. 700, 718.)

Here, appellant's statements the day after the 7-Eleven incident did not describe his mental state when they were spoken. The statements referred back to his mental state the previous night. Thus, the statements were not admissible under section 1250.

A statement of a declarant's *previously* existing mental or physical state is admissible only if it meets the requirements of section 1251. Those requirements include the unavailability of the declarant as a witness. (§ 1251, subd. (a).) Here, appellant was available as a witness, and so did not satisfy the requirements of section 1251. (See *People v. Edwards* (1991) 54 Cal.3d 787, 819 [defendant's exercise of Fifth Amendment privilege not to testify did not make defendant unavailable as a witness within the meaning of section 1251].)

In addition, statements which meet the requirements of sections 1250 or 1251 are not admissible if they are made under circumstances which indicate their lack of trustworthiness. (§ 1252.) Here, the trial court found that the statements were not reliable, in large part because they were made the next day and were efforts by appellant to "explain[] himself." For this additional reason, the trial court did not abuse its discretion in excluding the statements.


2. Defense of necessity

Appellant contends the trial court erred in failing to instruct the jury sua sponte on the defense of necessity. We see no error.

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that [the Court believes] is however

predominantly legal. As such it should be reviewed without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Shaw* (2002) 97 Cal.App.4th 833, 838 [assertions of instructional error are reviewed de novo].)

A trial court has a sua sponte duty to instruct on the defense of necessity when there is substantial evidence to support the proposed defense. (See *People v. Barraza* (1979) 23 Cal.3d 675, 691.) "The standard for evaluating the sufficiency of the evidentiary foundation is whether a reasonable jury, accepting all the evidence as true, could find the defendant's actions justified by necessity." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1539.)

"The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime." (*People v. Beach* (1987) 194 Cal.App.3d 955, 971.) "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency. [Citations.]" (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.) Necessity is an affirmative defense. (*People v. Heath* (1989) 207 Cal.App.3d 893, 901.)

The defense of necessity does not negate any element of the crime, but represents a public policy decision not to punish an individual despite proof of the crime. (*People v. Heath, supra,* 207 Cal.App.3d at p. 901.)

The trial court did not err in failing to instruct on the necessity defense. Appellant's statement to Lampman that "they" were trying to kill him and he had to run away, is evidence showing that appellant had a good faith belief in the necessity of taking the car. This is not enough.

There is no evidence that appellant lacked an adequate alternative to taking the car. There is nothing to suggest that appellant could not have simply walked away.

Appellant contends that if he had not taken the car, but had fled on foot, Rivas and his friends would have come after appellant in Rivas's car. There is no evidence to

9

support such an inference. When the fight began, Rivas sought police help by calling 911. There is no reason to believe Rivas would have taken the law into his own hands and pursued appellant if he had fled on foot. Similarly, Alzaga attempted to escape from appellant by getting into the car. There is no reason to believe that Alzaga would have pursued appellant if he fled on foot. The remaining members of Rivas's party sought shelter inside the 7-Eleven. There is no reason to believe they would have pursued appellant if he had fled on foot. A good faith belief on appellant's part that he would have been pursued is not enough; the belief must be objectively reasonable. Appellant's was not.

Further, there is no evidence to support the last element of the necessity defense, which required appellant to show that he did not contribute substantially to the emergency. To the contrary, the evidence shows that appellant did contribute substantially to any emergency. While there is conflicting evidence about who threw the first punch, uncontradicted evidence showed that appellant acted very aggressively before and after the first blow was struck. Appellant approached the car and leaned inside, ignoring Alzaga's directive to go away. When Alzaga got out of the car and repeated his directive to appellant to go away, appellant rushed toward Alzaga. Even if Alzaga threw the first punch, accounts show that appellant more than held his own in the ensuing fight. When a stranger intervened, Alzaga got back inside the car and closed the door. Appellant pulled Alzaga out. When Rivas told appellant he was calling 911, appellant tried to take Rivas' phone away from him, and hit him on the cheek. Thus, appellant repeatedly failed to take the opportunity to break off the fight and instead chose to escalate the situation by going on the offense.

Since there is no evidence to support at least two of the elements of the necessity defense, the trial court did not have a sua sponte duty to give an instruction on the defense.

3. Sufficiency of the evidence to support appellant's count 2 conviction

Appellant contends there is insufficient evidence to support his carjacking conviction as to Alzaga because there is insufficient evidence to show he specifically intended to deprive Alzaga of possession of the vehicle before or during the use of force and to show movement of the vehicle at that time. He further contends that such a conviction violates his federal constitutional right to due process. There is sufficient evidence to support the conviction.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

"Carjacking is 'the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear.') (§ 215, subd. (a).)" The requisite intent must be formed before or during the use of force or fear. (*People v. Gomez* (2011) 192 Cal.App.4th 609, 618, 622.)

"'In the usual case of carjacking involving multiple occupants, all are subjected to a threat of violence, all are exposed to the high level of risk which concerned the

11

Legislature, and all are compelled to surrender their places in the vehicle and suffer a loss of transportation. All are properly deemed victims of the carjacking.' [Citation.]" (*People v. Hill* (2000) 23 Cal.4th 853, 859.) Multiple convictions are proper when there are multiple victims.

a. Specific intent

According to Alzaga, when appellant first approached the car, he leaned in through an open window so that his head and the upper part of his chest were inside the car. Appellant was "taking [a] view of the interior" of the car. Such a view would have revealed that the car had a keyless ignition; the engine started with the push of a button as along as the key fob was within 10 feet of the car. Appellant made no attempt to obtain keys from Rivas before getting into the car, which was not running at that time.[4] This supports an inference that appellant formed the intent to take the car when he looked inside and saw that it was a keyless ignition which could be started without physical possession of a key.

Further, when Alzaga took refuge in the car during his fight with appellant, appellant pulled him out of the car. Appellant contends his actions show that he wanted to continue the fight with Alzaga out of anger at Alzaga. Perhaps so. The evidence also supports a reasonable inference that appellant began the fight with Alzaga to gain undivided possession of the car. The fight between the two men began after Alzaga told appellant to get away from the car, then got out of the car when appellant did not heed his verbal directive. The physical fight which ensued between the two men could reasonably be understood as an attempt by appellant to obtain possession of the car, and by Alzaga to prevent appellant from obtaining possession. Thus, a continuation of the fight would be a continuation of the struggle for the car. We view the evidence in the light most favorable to the judgment. (*People v. Nelson, supra,* 51 Cal.4th at p. 210 ["if the circumstances

---

[4] According to Rivas, appellant turned the car on when he got inside after the fights.

12

reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding."].)

b. Movement from immediate presence of victim

Appellant contends Alzaga fled inside the 7-Eleven after being pulled out of the car, then Rivas came out of the 7-Eleven and appellant briefly fought with him and then took the car. Thus, appellant contends, the car was not moved during his encounter with Alzaga and so there was no carjacking as to Alzaga.

The evidence of Alzaga's movements is not as clear as appellant asserts. Even assuming Alzaga was inside the 7-Eleven when appellant drove away in the car, however, that would be sufficient to support the carjacking conviction as to Alzaga. A defendant cannot use force or fear with the intent of depriving a person of possession of a car, then when the force or fear successfully causes the person to give up possession of the car and flee, claim it is not carjacking because the person fled before the carjacker moved the car. Further, there is no requirement that the carjacking victim be next to the car when the carjacker drives away. (See *People v. Gomez* (2011) [immediate presence requirement of carjacking satisfied when victim fled to apartment after being attacked by defendants; defendants later approached truck and apartment; victim, fearing a further attack stayed inside apartment while defendant took victim's truck parked ten feet away]; *People v. Hoard* (2002) 103 Cal.App.4th 599, 609 [immediate presence requirement of carjacking satisfied when defendant forced victim to give up her car keys inside the store and then drove away the car parked outside in the parking lot]; *People v. Medina* (1995) 39 Cal.App.4th 643, 651-652 [immediate presence requirement of carjacking satisfied when victim was lured into motel room and bound, defendant took victim's key and drove car parked outside away].)

To the extent that appellant contends that his decision to fight with Rivas somehow terminated his culpability toward Alzaga, appellant is mistaken. There is no requirement that a carjacker simultaneously fight with both the owner and passenger of a vehicle for both persons to be victims of the carjacking. Attacking them serially is

13

sufficient.  In such a situation, "'all are subjected to a threat of violence, all are exposed to the high level of risk which concerned the Legislature, and all are compelled to surrender their places in the vehicle and suffer a loss of transportation.  All are properly deemed victims of the carjacking.'  [Citation.]"  (*People v. Hill*, *supra*, 23 Cal.4th at p. 859.)

Since we have determined "that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation] as is the due process clause of article I, section 15 of the California Constitution."  (*People v. Osband* (1996) 13 Cal.4th 622, 690.)


4.  Sentence

Appellant contends the trial court abused its discretion in sentencing him to the upper term of nine years on count 1 in light of the court's denial of appellant's motion to strike his prior conviction, its mandatory imposition of the five-year enhancement term under section 667, subdivision (a)(1) and its choice to sentence count 2 consecutively.  Appellant's total sentence was 27 years, four months.  He contends the midterm would have resulted in a total sentence of 18 years, 4 months, and that total is appropriate for his offenses.

A trial court's sentencing decision will not be disturbed on appeal unless it is so irrational or arbitrary that no reasonable person could agree with it.  (*People v. Carmony* (2004) 33 Cal.4th 367, 377; *People v. Jones* (2009) 178 Cal.App.4th 853, 860.)  "The trial court's sentencing discretion must be exercised in a manner . . . that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.'  [Citation.]"  (*People v. Sandoval* (2007) 41 Cal.4th  825, 847.)  The court abuses its discretion if it fails to exercise its discretion in sentencing, relies upon irrelevant circumstances, or relies upon circumstances that constitute an improper basis for the decision.  (*Id*. at pp. 847-848.)  The burden is on the party attacking the sentence to show that the sentencing decision

was irrational or arbitrary, and an appellate court will not substitute its judgment for that of the trial court. (*People v. Jones, supra*, 178 Cal.App.4th at p. 861.)

The court denied appellant's motion to strike his 2002 prior because of appellant's "record and looking at the severity of that record, history of violence, and looking at the current offense which defendant was convicted of two violent felonies." Appellant does not challenge this ruling.

The court explained its selection of the high term as follows: "[Appellant] is statutorily ineligible for probation. If I look at circumstances in aggravation, the defendant is engaged in violent conduct that indicates a serious danger to society. That is an aggravating factor. [Appellant] was [on] probation or parole when the crime was committed, and the defendant's prior performance on probation or parole was unsatisfactory." The court imposed the mid-term for count 2 consecutively because it involved a separate victim.

Appellant acknowledges that the factors relied on by the trial court in selecting the upper term are relevant sentencing factors under California Rules of Court, rule 4.421(a). He contends, in effect, that there were mitigating factors which outweighed the aggravating factors identified by the court. Specifically, appellant contends: "The nature of this crime was instinctual. Appellant acted in fear for his life fleeing in the car for two miles. Further, he was not the sole aggressor in the incident and did not strike the first blow. There was no sophisticated planning, or any weapons involved, and his version of the events was diametrically opposed to that of the victims. By taking the car appellant chose the lesser of two evils, the threat of great bodily harm to himself." He also contends the victims' injuries were minor, but his girlfriend testified that when she saw appellant the morning after the incident, he had been badly beaten.

As appellant acknowledges, the victims' account of events differed dramatically from appellant's account. The trial court was not required to accept appellant's version of events, and apparently did not. That rejection does not mean the court failed to make an "individualized consideration of the offense, the offender and the public interest" as appellant claims. (See *People v. Sandoval, supra*, 41 Cal.4th at p. 847.) Appellant's

conduct was violent and posed a danger to the community. The fact that he committed the present offenses while on probation or parole for another offense shows that he was not easily deterred from criminal conduct. A rational court could have found that the high term and resulting 27 year sentence was appropriate.

Disposition

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MINK, J.[*]

We concur:

TURNER, P.J.

KRIEGLER, J.

---

[*]    Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16